UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| **ROY AUTRY**, | § | |
| | § | |
| *Plaintiff,* | § | |
| **v.** | § | |
| | § | **EP-19-CV-00154-DCG** |
| **AHERN RENTALS, INC.,** *d/b/a Ahern And Sales,* | § | |
| | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION AND ORDER

Presently before the Court is Defendant Ahern Rentals, Inc. d/b/a Ahern And Sales's "Motion for Summary Judgment" (ECF No. 46). For the reasons that follow, the Court grants in part and denies in part Ahern's motion.

## I.   BACKGROUND

### A.   Factual Background[1]

Plaintiff Roy Autry is a United States citizen by birth and of Mexican descent.[2] Ahern is a Nevada based equipment rental company; it offers heavy machinery and equipment, such as generators, forklifts, and scissor lifts, for rent.[3] Ahern's customers at its El Paso, Texas branch are predominantly of Mexican descent, and many of them speak Spanish only.[4] Autry is a bilingual English and Spanish speaker.[5]

---

[1] Because of the summary judgment stance, this recitation takes facts in the light most favorable to Plaintiff. *See Starnes v. Wallace*, 849 F.3d 627, 630 n.1 (5th Cir. 2017).

[2] Def.'s First Am. Original Ans. at ¶ 14, ECF No. 7; Autry Dep. at 22:16–17, 131:22, 204:4, ECF No. 56-1.

[3] *See* Def.'s First Am. Original Ans. at ¶ 2; Autry Dep. at 89:16–18, 208:2–9, 274:7, 281:12–19.

[4] *See* Rivera Dep. at 91:6–13; Autry Dep. at 144:10–14.

[5] Avila Aff. at 1–2, ECF No. 56-3.

In August 2014, Ahern hired Autry as an outside sales representative at its El Paso location.[6]  Autry's position required him to contact business owners and solicit business for Ahern.[7]  His duties included visiting customers and their construction job sites on a daily basis and occasionally delivering equipment to customers.[8]

Ahern provides its outside sales representatives with vehicles, such as trucks, for its business use.[9]  According to its vehicle use policy, such vehicles are provided solely for use within the scope and course of the employees' employment.[10]  With a supervisor's authorization, an employee may use the vehicle for driving to and from the workplace and may otherwise use the vehicle within the scope of the business day, which may include customer interactions.[11]  The policy expressly prohibits use of its vehicles for "personal errands or any non-employment or [non-]business-related trips" and "under the influence of alcohol."[12]

Ahern also provides its outside sales representatives with "Purchase Card" or "P-Card," which the employees can use to pay for their customers' foods and drinks at restaurants and entertainment venues.[13]  According to its P-Card policy, all purchases must be for business

---

[6] Pl.'s Resp. to Def.'s Proposed Undisputed Facts at 5, ECF No. 59.

[7] *See, e.g.*, Avila Dep. at 13:3–4, ECF No. 68-5.

[8] *See, e.g.*, Autry Dep. at 262:11–12; 281:12–19; 282:3–5; Avila Dep. at 61:10–11.

[9] Autry Dep. at 182:14–17; 264:23; 267:20–268:4; Avila Dep. at 23:11–12.

[10] Def.'s Mot. Exs. at 17, ECF No. 46-2.  Ahern Rentals filed a single document spanning over 306 pages, which contains multiple exhibits submitted in support of its motion.  Citations to these exhibits refer to the page numbers imprinted at the top of the pages by the Court's Case Management and Electronic Case Filing system.

[11] *Id.*

[12] *Id.*

[13] *Id.* at 19; Autry Dep. at 267:4–5, 331:4–13; Avila Dep. at 26:18–21.

purposes only.[14]  Further, "[b]eer is limited to 1 per person during a [*sic*] afterhours business entertainment event," and "[t]he employee is allowed 1 beer only."[15]

On November 27, 2018, Autry and Hector Avila, another Ahern outside sales representative, set up a meeting with their respective customers for later that evening at a restaurant in El Paso.[16]  Autry and Avila went to the restaurant around 6 p.m., but the customers did not show up.[17]  After the two had dinner, they took off in their respective trucks, Autry following Avila.[18]  At around 7:30 p.m., a driver hit Avila's truck and took off.[19]  Autry witnessed the accident, but his truck was not involved in the accident.[20]  Autry called 911 and then followed the hit-and-run driver for about 30 to 40 minutes until police pulled the driver over.[21]  As a result of the accident, Avila was injured, and he was taken to a hospital.[22]

On December 5, 2018, Kevin Harley, Autry's immediate supervisor and Sales Manager of Ahern's El Paso branch, called Autry—who was at the time, out and about visiting customers and job sites—and asked him to come to Ahern's office.[23]  Upon arriving at the office, Autry sat

---

[14] Def.'s Mot. Exs. at 19.

[15] *Id.*

[16] Autry Dep. at 216:8–217:5, 225:13–15.

[17] *Id.* at 217:6–10, 225:17–18; Avila Dep. at 81:15–17.

[18] Autry Dep. at 219:4–5, 225:17–18; Avila Dep. at 81:23.

[19] Autry Dep. at 218:15–20, 220:20–221:9.

[20] *Id.*

[21] *Id.* at 221:14–18, 223:23, 224:15–16.

[22] Avila Dep. at 12–13; Autry Dep. at 232:19–23

[23] Autry Dep. at 262:2–24.

down for a meeting with Harley; also present at the meeting were Curtis Torres, General Manager of Ahern's El Paso branch; Kevin Stock, Ahern's Regional Sales Manager; and Bob Bonacci, Ahern's Vice President ("VP") of Operations.[24]  At the meeting, Autry was questioned about the November 27, 2018 accident.[25]  According to Autry, they were trying to coerce him to say that he saw Avila drink alcohol before the accident.[26]  He was asked if he saw Avila drink alcohol; he replied, "no."[27]  Bonacci reacted: "Well, we figured you'd cover for him."[28]  Another said, according to Autry, "Well, . . . there goes the workmen's comp deal."[29]  They also asked him whether he used Ahern-provided truck for personal use.[30]  Specifically, Bonacci told him that they noticed from the truck's GPS data that Autry went to "a lot of strip clubs."[31]  Autry responded: "Yeah, you guys tell me to go take customers and stuff, yeah.  I do go to strip clubs."[32]  Autry was told that he "broke company policy" and was let go.[33]  A performance

---

[24] *Id.*

[25] *Id.* at 262:24–263:1.

[26] *Id.* at 266:4–5.

[27] *Id.* at 263:9–10.

[28] *Id.* at 263:24–264:2.

[29] *Id.* at 266:11–12.  Avila testified that after he was terminated, Torres prepared paperwork for Avila's claim for workers' compensation benefits, but the claim was denied.  *See* Avila Dep. at 95:22–96:23.

[30] Autry Dep. at 264:7–8.

[31] *Id.* at 265:2–7.

[32] *Id.*  According to Avila, the upper management, including Stock and Bonacci, encouraged outside sales representatives to take top customers to strip clubs.  Avila Dep. at 144:2–18.  According to Rivera, although, on paper, outside sales representatives were not allowed to take clients to bars or strip clubs, Stock told them that they could and showed them how to hide the fact of taking clients to strip clubs.  Rivera Dep. at 127:11–14, 128:22–129:7, 129:21–130:5, ECF No. 68-6.

[33] Autry Dep. at 265:13–14.

action form dated December 5, 2018, lists Ahern's reason for his termination as "Policy

Violation -Company vehicle."[34]  Ahern's branch manager and VP signed the form, but Autry

declined to sign it when he was presented with it at the meeting.[35]  Avila also was terminated on

the same day.[36]

On February 19, 2019, Autry contacted the Equal Employment Opportunity Commission

("EEOC") and completed an intake questionnaire.[37]  On March 20, proceeding *pro se*, he filed a

charge of discrimination.[38]  On April 17, 2019, the EEOC sent Autry a notice of right to sue.[39]

**B.  Procedural Background**

On June 10, 2019, Autry brought this lawsuit against Ahern, and on the following day, he

filed his "First Amended Complaint" (ECF No. 5).  He asserts claims for hostile work

environment, discrimination, and  retaliation on the basis of race and national origin—in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. and the Civil

Rights Act of 1866, 42 U.S.C. § 1981.[40]

In September 2020, Ahern filed the instant motion for summary judgment.  Def.'s Mot.

for Summ. J. [hereinafter Def.'s MSJ], ECF No. 46.  The parties' briefing on the motion was

completed by early October 2020.  Pl.'s Resp. to Def.'s Mot. for Summ. J. [hereinafter Pl.'s

---

[34] Def.'s Mot. Exs. at 35.

[35] *Id.*; Autry Dep. at 264:2–6, 265:14–18.

[36] Avila Dep. at 12:3–6.

[37] Def.'s Mot. Exs. at 37.

[38] *Id.* at 47.

[39] *Id.* at 49.

[40] Pl.'s First Am. Compl. ¶¶ 41–43, 48, ECF No. 5.

Resp. to MSJ], ECF No. 56; Def.'s Reply in Supp. of Mot. for Summ. J. [hereinafter Def.'s

Reply to MSJ], ECF No. 60.

Also in October 2020, Ahern filed a "Motion to Strike and Motion for Sanction" (ECF

No. 61), and Autry followed by filing a response (ECF No. 64) to that motion.  Later, in the same

month, Ahern filed an "Amended Motion to Strike and Motion for Sanction" (ECF No. 67), and

Autry filed a response (ECF No. 68) to the same.  In the meantime, Autry filed a "Second

Motion to Compel Discovery from Defendant, Motion for Sanctions, and Motion for

Continuance" (ECF No. 58), and the parties' briefing on that motion (ECF Nos. 63, 66) was

completed by late October 2020.[41]

In November 2020, the Court vacated trial setting and notified the parties that it would set

a new trial date after it decides the pending motion for summary judgment, motion to strike, and

motion to compel.[42]  The Court now addresses these motions.[43]

## II.   STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "A fact is 'material' if and only if proof of its existence might affect the

outcome of the case," *Roy v. City of Monroe*, 950 F.3d 245, 254 (5th Cir. 2020), and a dispute

about a material fact is genuine if "the evidence is such that a reasonable jury could return a

---

[41] Previously, Autry filed his first motion to compel discovery from Ahern (ECF No. 21), and in June 2020, the Court ruled on that motion.  Mem. Order, ECF No. 35.

[42] Order Vacating Trial Setting, ECF No. 70.  At the time, due to the COVID-19 Pandemic, civil jury trials were continued throughout the Western District of Texas by Chief Judge Orlando Garcia's Order; jury trials were further continued up until May 2021.  *See* Coronavirus (Covid-19) Guidance (W.D. Tex.), https://www.txwd.uscourts.gov/coronavirus-covid-19-guidance/ (last visited Sept. 6, 2021).

[43] In a separate order, the Court will rule on Autry's motion to compel.

verdict for the non-moving party," *Amerisure Ins. v. Navigators Ins.*, 611 F.3d 299, 304 (5th Cir. 2010).

In deciding whether a genuine dispute as to material fact exists, a trial court "consider[s] all of the evidence in the record," *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007), "view[s] all facts and evidence in the light most favorable to the non-moving party," *Weber v. BNSF Ry.*, 989 F.3d 320, 323 (5th Cir. 2021) (cleaned up), and "draw[s] all reasonable inferences in that party's favor," *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020). The court refrains from making credibility determinations—*i.e.*, determining the truth of the matter—or weighing the evidence.  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Turner*, 476 F.3d at 343.  The court "must disregard evidence favorable to the moving party that the jury is not required to believe." *Laxton v. Gap Inc.*, 333 F.3d 572, 577 (5th Cir. 2003).  Instead, "the evidence of the nonmovant is to be believed." *Davenport v. Edward D. Jones & Co., L.P.*, 891 F.3d 162, 167 (5th Cir. 2018) (cleaned up).  However, the court "need not credit evidence that is merely colorable or not significantly probative." *Id.* (same).

Procedurally, the party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion[] and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (cleaned up).  When the nonmoving party will bear the burden of proof at trial, the moving party may satisfy this responsibility by "pointing to an absence of evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005); *see also Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990).

If the moving party succeeds, "the onus shifts to the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *LHC Grp.*, 773 F.3d at 694 (cleaned up); *see also* Fed. R. Civ. P. 56(c)(1)(A). Although courts draw all reasonable inferences in favor of the nonmovant, he "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner*, 476 F.3d at 343 (cleaned up). Nor can he with "some metaphysical doubt as to the material facts." *Funches v. Progressive Tractor & Implement Co.*, 905 F.3d 846, 849 (5th Cir. 2018).

## III.   DISCUSSION

Ahern moves for summary judgment in its favor on Autry's claims for hostile work environment, discrimination, and relation. In support, Ahern presents a plethora of arguments. Before addressing the merits of Autry's claims, the Court addresses two preliminary matters: Ahern's motion to strike certain affidavits and its argument that Autry is not a member of a protected class—an issue that bears on his hostile work environment and discrimination, claims.[44]

---

[44] Ahern makes a third argument that calls for preliminary disposition. It argues that Autry filed a charge of discrimination with the EEOC, but not with the Texas Workforce Commission Civil Rights Division ("TWC"), and therefore his Title VII claims should be dismissed for failure to exhaust administrative remedies. Def.'s MSJ at 4–6. As Autry points out, the TWC, the successor to the Texas Commission on Human Rights ("TCHR"), has a "worksharing" agreement with the EEOC. *Vielma v. Eureka Co.*, 218 F.3d 458, 462 (5th Cir. 2000); *see also Free v. Granite Publ'ns, L.L.C.*, 555 S.W.3d 376, 377 (Tex. App.—Austin 2018, no pet.) ("In 2004 , the Texas Commission on Human Rights (TCHR) was replaced with the Texas Workforce Commission civil rights division (TWC)."). Therefore, "when a complainant files [his] initial charge with the EEOC, [his] charge will also be considered filed with the TCHR." *Vielma*, 218 F.3d at 462–63; *see also Fort Bend Cnty., Tex. v. Davis*, 139 S. Ct. 1843, 1846 (2019) ("If the state or local agency has a 'worksharing' agreement with the EEOC, a complainant ordinarily need not file separately with federal and state agencies. She may file her charge with one agency, and that agency will then relay the charge to the other."). Moreover, before the EEOC, Autry submitted a standard-form charge of discrimination ("EEOC Form 5 (11/09)"), which conspicuously states, "Texas Workforce Commission Civil Rights Division and EEOC." Def.'s Exs. at 47. Ahern's argument lacks merits.

## A.  Preliminary Matters

### 1.  *Ahern's Motion to Strike*

In his response to Ahern's motion for summary judgment, Autry relies on affidavits by Avila, Francisco Rivera, David Crider, and Cesar Macias—all of whom are former Ahern employees and were Autry's co-workers.   Ahern separately filed its motion to strike, wherein it asks the Court to strike these affidavits and Autry's response, and sanction Autry's counsel. Def.'s Am. Mot. to Strike. & Mot. for Sanctions at 12 [hereinafter, cited as Mot. to Strike], ECF No. 67.

Rule 56 allows a party to provide an affidavit to support or oppose a motion for summary judgment.  *See* Fed. R. Civ. P. 56(c)(1)(A).  Prior to December 1, 2010, the proper method by which to attack an affidavit was by filing a motion to strike.  *Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 515 (5th Cir. 2012).  However, 2010 amendments to the Rule have made it unnecessary for parties to file such a motion; instead, the party may simply object to the material.  *Id.*  Hence, courts treat separately filed motions to strike as mere objections to summary judgment evidence.  *See id.*

As a background, Avila, Rivera, and Crider's affidavits were prepared in March and April 2020, and Macias's in August 2020.   The record reflects that Autry's counsel interviewed each of the affiants, took notes during the interviews, and prepared drafts of the affidavits, and thereafter, the affiants reviewed the draft affidavits and signed them.  *See, e.g.*, Avila Dep. at 7:13–22, 116:22–117:25; Rivera Dep. at 6:12–7:25; *see also Russell v. Acme-Evans Co.*, 51 F.3d 64, 67 (7th Cir. 1995) ("Almost all affidavits submitted in litigation are drafted by the lawyers rather than by the affiants[.]").

In late April 2020, Autry submitted Avila, Rivera, and Crider's affidavits in support of his first motion to compel discovery, and Ahern was served with these affidavits.  Pl.'s Mot. to Compel, Exs. M, N, O, ECF Nos. 21-13, 21-14, 21-15.  In August 2020, Ahern deposed Avila, Rivera, and Crider, and during their depositions, Ahern's counsel thoroughly questioned them about the statements they provided in their earlier affidavits.  *See, e.g.*, Avila Dep. at 116:11–140:25.  Based, in large part, on their answers to counsel's questions, Ahern moves to strike their affidavits.  Ahern advances several arguments.

First, Ahern argues that the affidavits are unreliable and contain inconsistent, inaccurate, and false statements.  Mot. to Strike at 1.  Ahern specifically points out several statements in the affidavits that, it claims, are inaccurate in light of the affiants' subsequent deposition testimony.[45] For example, in his affidavit, Avila stated that "Kevin Stock, Antony Buttshaw, Bob Bonucci [*sic*] and Mark Brown and Loyal Numan [*sic*] made the same racial slurs to Roy Autry and me, 'beaner, wetback, dirty Mexican, filthy Mexican, go back to Juarez, go back to Mexico' whenever they came into town."  Avila Aff. at 3.  At his deposition, he clarified that Brown (Ahern's CEO) did not call him "beaner, wetback, dirty Mexican, filthy Mexican," but said only that "go back to Juarez, go back to Mexico."  Avila Dep. at 129:21–130:4.  In other words, the affidavit statement's attribution to Brown was partially inaccurate.  Avila however confirmed that the statement, in full, is accurate to the extent it applies to the other named Ahern supervisors and high-ranking officers.  *Id.* at 131:13–132:24.  As another example, Rivera stated in his affidavit that "When I first started, . . . Bob Bannucchi [*sic*] was the Operations Manager."

---

[45] The Court notes *en passant* that the so-called "sham affidavit" doctrine is inapplicable to the affidavits at issue here.  The doctrine holds that "a plaintiff may not manufacture a genuine issue of material fact by submitting an affidavit that impeaches *prior* testimony without explanation."  *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000) (emphasis added).  In contrast, here, the affiants' depositions followed their *prior* affidavits.

Rivera Aff. at 1.  At his deposition, Rivera testified that Bob Freiberg, not Bob Bonacci, was the Operations Manager.  Rivera Dep. at 90:2–5.

As mentioned, Ahern's counsel thoroughly examined Avila, Rivera, and Crider regarding their statements in the affidavits.  And the transcripts of their deposition testimony were made part of the record: after the close of summary judgment briefing, Autry submitted full copies of the transcripts in response to Ahern's motion to strike.  The Court therefore may consider the transcripts in ruling on Ahern's motion for summary judgment.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").  Accordingly, the Court will disregard the objected-to portions of the affidavits that the affiants later clarified or recanted at their depositions, and as to those portions, the Court will instead rely on the version of the facts they presented at depositions.

Second, Ahern argues that Avila's affidavit should be stricken, additionally because Autry's version of the events leading up to the November 27, 2018 auto-accident, which he provided during his deposition, differs from Avila's version of the same, which Avila provided in his affidavit.  Mot. to Strike at 2–4.  Their versions differ in the following respects: the specific restaurant they went to before the accident occurred; whether they had clients with them at the restaurant; whether after leaving the restaurant, they went to a Walgreens to pick up supplies for an Ahern event; and the precise location where the accident happened.  *See id.*

Ahern in essence asks the Court to make a credibility determination, which it may not do on a summary judgement posture.[46]  Moreover, at his deposition, which was held nearly two years after the accident, Autry testified that he could not recall everything about the accident in

---

[46] Ahern similarly argues that Crider's affidavit should be stricken because of his felony conviction for mail fraud. Mot. to Strike at 9.  The Court rejects this argument because it calls for credibility determination.

detail.  Autry Dep. at 218:8–9.  Critically, though, the matters on which they differ are not material to the summary judgment motion—as suggested by the fact that neither party relies on those matters in their briefs.  Therefore, for purposes of the summary judgment motion, the Court will not, as it need not, rely on the matters on which Avila and Autry's versions differ.

Third, Ahern argues that Rivera's affidavit should be stricken, additionally because he did not sign the affidavit in front of a notary public.  Mot. to Strike at 6.  This argument has some traction.  The affidavit indicates that Rivera signed it on March 9, 2020, and a notary public in and for the State of Texas signed it three days later, stating "sworn to and subscribed before me."  Rivera Aff. at 4 (capitalization omitted).  At his deposition, Rivera confirmed that he did not execute the affidavit before a notary public.  Rivera Dep. at 8:4–8, 131:25–132:8.

It thus appears that the notary public "violated the proper procedure for notarizing affidavits."  *Miller v. Home Depot U.S.A., Inc*., 95 F.3d 50, 1996 WL 457403, at *2 (5th Cir. July 15, 1996) (unpublished table decision).[47]  Accordingly, the Court sustains Ahern's objection to Rivera's affidavit on this ground, and it will disregard the affidavit as summary judgment evidence.  *See Martin v. Frail*, No. SA-09-CA-695-OG, 2010 WL 11506662, at *5 (W.D. Tex. Oct. 28, 2010) (striking an affidavit because its affiant "did not personally appear before the notary"); *see also Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1305–06 (5th Cir. 1988) (disregarding a notarized affidavit for summary judgment purposes because it was "neither sworn nor its contents stated to be true and correct nor stated under penalty of perjury").  Nevertheless, at his deposition, Rivera testified under oath and adopted all of the statements in his affidavit—with three minor exceptions that are not material to the parties' arguments on

---

[47] *See also Ford Motor Co. v. Leggat*, 904 S.W.2d 643, 645–46 (Tex. 1995) (An affidavit is "a statement in writing of a fact or facts signed by the party making it, sworn to before an officer authorized to administer oaths, and officially certified to by the officer under his seal of office." (citing Tex. Gov't Code § 312.011)).

Ahern's summary judgment motion.  Rivera Dep. 6:24–7:1; *see also* Mot. to Strike at 7–8 (pointing out three inconsistencies).  Therefore, for purposes of the summary judgment motion, the Court will rely on Rivera's deposition testimony in lieu of his affidavit.

Finally, Ahern argues that Macias's affidavit should be stricken because Autry produced a copy of the affidavit only a day before the discovery deadline and therefore, Ahern could not depose Macias.  Mot. to Strike at 9–10.  At the time, the discovery deadline was set as August 15, 2020.  The record indicates that on February 1, 2020—more than six months before the discovery deadline—Autry disclosed Macias as an individual likely to have discoverable information.  *See* Pl.'s Second Resp. to Reqs. for Disclosures from Def. at 5, ECF No. 61-4.  On its face, the affidavit shows that Macias executed it on August 14, 2020.  Further, on the same day, as Ahern concedes, Autry's counsel produced a copy of the affidavit.

On these facts, the Court is unable to conclude that Autry violated any rules governing discovery such that Macias's affidavit should be stricken.[48]  *See Brooks v. Stringer*, No. CIVA 204CV120KS-MTP, 2007 WL 43819, at *3 (S.D. Miss. Jan. 5, 2007) ("[T]here is no requirement that a party create documents to respond to document requests.").  Certainly, Ahern could have filed a motion to continue the discovery deadline—if it needed time to depose Macias; it did not.  The Court overrules Ahern's objections to Macias's affidavit.

In sum, consistent with the above discussion, the Court sustains in part and overrules in part Ahern's objections to the affidavits.[49]  Therefore, the Court grants in part and denies in part Ahern's motion to strike.   The Court specifically denies Ahern's requests to strike Autry's

---

[48] In any event, the Court notes that the information Macias provided in his affidavit is cumulative of the information provided by Autry and others during their depositions.

[49] The Court overrules Ahern's objections based on any other arguments to the extent that the Court has not specifically addressed them.

response and to sanction his counsel.

## 2. *Autry's Membership in a Protected Class*

Autry claims that he is Hispanic and a Mexican American.  Pl.'s Resp. to MSJ at 7.
Ahern contends that Autry is not a member of a protected class and argues that he has failed to
establish otherwise.  Def.'s MSJ at 9; Def.'s Reply to MSJ at 4.

Autry sued under Title VII and § 1981.  Title VII prohibits discrimination "because of
[an] individual's *race*, color, religion, sex, or *national origin*."  42 U.S.C. § 2000e-2(a)(1)
(emphasis added).  The term "race," for purposes of Title VII, encompasses Hispanic ethnicity.
*Vill. of Freeport v. Barrella*, 814 F.3d 594, 607, 616 (2d Cir. 2016); *see also id.* at 604 n.21
("'Hispanic' emphasizes links to the language, people, or culture of Spain.").  "The term
'national origin' on its face refers to the country where a person was born, or, more broadly, the
country from which his or her ancestors came."  *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88
(1973).  The EEOC's guidelines on discrimination define "discrimination based on national
origin" broadly, to include acts of discrimination undertaken "because an individual (or his or
her ancestors) is from a certain place or has the physical, cultural, or linguistic characteristics of
a particular national origin group." 29 C.F.R. § 1606.1; *see also E.E.O.C. v. WC&M Enters.,
Inc.*, 496 F.3d 393, 401 (5th Cir. 2007) (citing to § 1606.1).

Section 1981, on the other hand,  forbids "racial" discrimination relating to the general
conditions of employment.[50]  *Evans v. City of Houston*, 246 F.3d 344, 357 (5th Cir. 2001); *see
also id.* at 356 n.9 ("[Section] 1981 prohibits only racial discrimination." (citing A*lizadeh v.*

---

[50] Section 1981 guarantees to "[a]ll persons within the jurisdiction of the United States . . . the
same right . . . to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a).  It
defines the phrase "make and enforce contracts" to include "the making, performance, modification, and
termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the
contractual relationship." *Id*. § 1981(b).

*Safeway Stores, Inc.*, 802 F.2d 111, 114 (5th Cir. 1986)).  It "protect[s] from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics," rather than based on "solely on the place or nation of [their] origin."  *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987).  The Fifth Circuit has held that "a complaint by Mexican-Americans alleging racial and ethnic discrimination 'clearly states a cause of action' under the statute."  *Bullard v. OMI Ga., Inc.*, 640 F.2d 632, 634 (5th Cir. 1981) (quoting *Alvarado v. El Paso Indep. Sch. Dist.*, 445 F.2d 1011 (5th Cir. 1971)); *see also Jatoi v. Hurst-Euless-Bedford Hosp. Auth.*, 807 F.2d 1214, 1218 (5th Cir. 1987) ("We have recognized the difficulty in distinguishing discrimination based on national origin from that based on race.").

Specifically, here, Ahern points out that at his deposition, Autry testified that he was born in the United States, and that "I was not Mexican, I am an American."  Def.'s MSJ at 9 (citing Autry Dep. at 136:13–14).  Ahern argues therefore that, he is not Mexican.  *Id.*  Ahern adds that Autry has not shown that his nation of origin is Mexico, that his parents or grandparents are Mexican, or that he is Hispanic.  Def.'s Reply to MSJ at 4.

The quoted excerpt, read in the full context of Autry's deposition, suggests that he was referring to his citizenship.[51]  That he is a United States citizen does to defeat his claim that he is

---

[51] Specifically, Autry testified as follows:

Q. Your next compliant was in March of 2015 to VP of sales Don Schultz. Again, was that about the training sessions?

A. Training sessions, about Mark Brown and also about Anthony Buttshaw, you know, getting on my nerves and following me around saying Mexican derogatory stuff to me. I clarified that I -- *I was not Mexican, I am an American*. If you want to put a color to me, call me a brown American, but don't – I'm – I'm a human race. Don't talk about race around me."

Autry Dep. at 136:10–19 (emphasis added).

Hispanic or Mexican American. *See, e.g.*, *Garza v. Laredo Indep. Sch. Dist.*, 309 F. App'x 806, 807, 809 (5th Cir. 2009) (stating that plaintiff, who was born in Texas, a United States citizen, and of Mexican heritage—and therefore, a "Mexican-American"—was a member of a protected class for purposes of his national origin discrimination claim under Title VII); *Bullard*, 640 F.2d at 634, *supra*.

Autry's evidence shows: he was born in Texas, Autry Dep. at 22:16–17; he lived in Juarez, Chihuahua, Mexico, for a part of his life, *id.* at 24:3–10; he is "brown," and of "Mexican descent," *id.* at 204:3–4; his mother is "Mexican looking," *id.* at 147:11, he identifies himself as part of the Hispanic community, *id.* at 146:7–8; and he is a bilingual English and Spanish speaker, Avila Aff. at 1–2. Moreover, in its Answer, Ahern admits that Autrey is of Mexican descent. *Compare* Def.'s First Am. Original Ans. at ¶ 14, *with* Pl.'s First Am. Compl. ¶ 14.

This evidence is sufficient to satisfy Autry's summary judgment burden to establish that he is a member of a protected class. *Cf. Bullard*, 640 F.2d at 634–35 ("The line between national origin discrimination and racial discrimination is an extremely difficult one to trace. An attempt to make such a demarcation before both parties have had an opportunity to offer evidence at trial is inappropriate.").

**B. Hostile Work Environment Claim**

Hostile work environment, discrimination, and retaliation claims are "not duplicative; rather, each represents a more or less distinct factual scenario." *Walton-Lentz v. Innophos, Inc*., 476 F. App'x 566, 569–570, 2012 WL 1428899, at *2 (5th Cir. Apr. 25, 2012) (unpublished). "A hostile work environment exists when the 'workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.'" *Johnson v. PRIDE Indus.,*

*Inc.*, 7 F.4th 392, 399 (5th Cir. 2021) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Ahern makes two principal arguments.  First, it argues that the Court should not consider any allegations outside Autry's EEOC charge.  *See* Def.'s Reply to MSJ at 3.  Second, it argues Autry cannot establish a prima facie case of hostile work environment.  *Id.* at 2; Def.'s MSJ at 15–16.  The Court addresses each in turn.[52]

## 1.  *Acts Outside the EEOC Charge*

Ahern points out that Autry alleges his supervisors, managers, and other superiors used racial slurs directed at Hispanic race.  Def.'s Reply to MSJ at 3 (citing to the portion of Autry's response to the summary judgment motion that addresses his hostile work environment claim). It adds that some of these acts occurred in 2015 and early 2018.  *Id.*  It says that the majority of

---

[52] Ahern advanced a third argument, which the Court easily dispenses with.  Specifically, Ahern argues that Autry did not plead a separate claim for hostile work environment and his complaint does not include such allegation.  Def.'s MSJ at 14.  "A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court."  *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005).

In his complaint, Autry sets out several factual allegations that on a number of occasions, Ahern's supervisors and high-ranking officers made racially derogatory remarks and committed other harassing acts.  *E.g.*, Pl.'s First Am. Compl. at ¶¶ 18–20, 23, 27.  He then alleges that "[a]s described above, Employer Ahern, by and through its agents, including General Manager Curtis Torres and Sales Manager Kevin Harley, . . . discriminated against and *harassed* Employee Autry, . . . merely because of the color of his skin, his race, ethnicity, and national origin."  *Id.* at ¶ 41 (emphasis added).

"An allegation of harassment is the underlying basis for a hostile work environment claim." *Melvin v. Barr Roofing Co.*, 806 F. App'x 301, 308 (5th Cir. 2020).  The Court finds that Autry's complaint gave Ahern a fair notice that he is asserting a hostile work environment claim based on his race and national origin.  *See Sanchez Oil & Gas Corp. v. Crescent Drilling & Prod., Inc.*, 7 F.4th 301, 309 (5th Cir. 2021) (The purpose of Federal Rule of Civil Procedure 8 "is to give the defendant fair notice of what the claim is and the grounds upon which it rests." (cleaned up)); *see also Melvin*, 806 F. App'x at 308 (stating plaintiff "sufficiently alleged a hostile work environment claim; failure to use the 'magic words' is not dispositive" (quoting *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 434 (5th Cir. 2000))); *Smith v. Barrett Daffin Frappier Turner & Engel, L.L.P.*, 735 F. App'x 848, 854 (5th Cir. 2018) ("It bears emphasizing that factual allegations alone may state a claim for relief—even without referencing the precise legal theory (or statute) upon which the plaintiff seeks relief.").

these acts were not even mentioned in Autry's EEOC charge.  *Id.*  Ahern then argues that the Court should not consider any of these allegations that are outside of Autry's EEOC charge.[53]  *Id.*  The Court disagrees.

A hostile work environment claim "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice,'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e–5(e)(1)), and therefore, is subject to the "continuing violation doctrine," a federal common law doctrine governing accrual, *Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 736, 740 (5th Cir. 2017).  Consequently, so long as one alleged act contributing to a plaintiff's hostile work environment claim is timely exhausted, the court may consider the entire period of the hostile environment.  *Morgan*, 536 U.S. at 105, 117; *Heath*, 850 F.3d at 736.

"Exhaustion occurs when the plaintiff files a timely charge with the EEOC."  *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 379 (5th Cir. 2002).  In Texas, a plaintiff has up to 300 days after the alleged discriminatory employment practice to file a charge with the EEOC.  *Washington v. Patlis*, 868 F.2d 172, 175 (5th Cir. 1989).  "EEOC charges, especially those by unlawyered complainants," are liberally construed.  *Fellows v. Universal Rests., Inc.*, 701 F.2d 447, 451 (5th Cir. 1983).

Autry filed his EEOC charge on March 20, 2019; therefore, Autry was required to exhaust at least one harassing act that occurred on or after May 24, 2018.  In his EEOC charge, Autry alleged, *inter alia*,[54] that on or about 2017-2018, Torres stated that "he did not speak that

---

[53] Ahern's argument implicates Autry's hostile environment claim under Title VII, but not the same under § 1981—because unlike Title VII, § 1981 does not require administrative exhaustion.  *Scarlett v. Seaboard Coast Line R.R.*, 676 F.2d 1043, 1050 (5th Cir. Unit B 1982).

[54] The EEOC charge contains additional allegations, which Ahern concedes "describe[] the acts of harassment."  Def.'s MSJ at 15 (listing allegations from the charge).

shit" in "reference to speaking Spanish."  Def.'s Mot. Exs. at 47.  Although at his deposition,

Autry testified to a similar statement, he was not asked to recall the date on which Torres made

the statement, *see* Autry Dep. at 141:2–144:14 (examined by defense counsel); however,

according to Avila, Torres made such remarks routinely.  *See* Avila Dep. at 74:5–16; *see also*

Avila Aff. at 2 ("[H]e *would* say about speaking Spanish, 'stop speaking that shit'" (emphasis

added)).  Avila was terminated in December 2018.  Drawing all reasonable inference in Autry's

favor, the Court concludes that Torres made at least one such remark after May 24, 2018.  As

such, the allegation that Torres used profanity in reference to Spanish language was timely

exhausted.  Further, Autry's evidence, which is canvassed below, shows that Torres's remark is

related to a continuing course of conduct.[55]  Therefore, contrary to Ahern's argument, the Court

may consider other instances of slurs directed toward Autry's Hispanic and Mexican-American

status.

## 2.  *Prima Facie Case of Hostile Work Environment*

To establish a hostile work environment claim either under Title VII or § 1981,[56] the

plaintiff must show that: (1) he belongs to a protected group; (2) he was subjected to unwelcome

---

[55] The Fifth Circuit has identified "three limits on the continuing violation doctrine: (1) the plaintiff must demonstrate that the separate acts are related; (2) the violation must be continuing; intervening action by the employer, among other things, will sever the acts that preceded it from those subsequent to it; and (3) the doctrine may be tempered by the court's equitable powers, which must be exercised to honor Title VII's remedial purpose without negating the particular purpose of the filing requirement."  *Heath*, 850 F.3d at 738 (cleaned up).

[56] Although Autry bases his claims on Title VII and Section 1981, the Court henceforth refers only to Title VII, because "when used as parallel causes of action, Title VII and Section 1981 require the same proof to establish liability and it would be redundant to refer to both of them."  *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 216 n.3 (5th Cir. 2016) (cleaned up); *see also Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309, 311 (5th Cir. 1999) ("Employment discrimination claims brought under 42 U.S.C. [ ]§ 1981 . . . are analyzed under the evidentiary framework applicable to claims arising under Title VII." (cleaned up)); *Hernandez v. Hill Country Tel. Co-op., Inc*., 849 F.2d 139, 142 (5th Cir. 1988) ("[C]laims alleged under Title VII and § 1981 [are] provable by the same facts.  Thus a finding of liability or non-liability under one statute satisfied the other.").

harassment; (3) the harassment was based on his membership in the protected group; (4) the

harassment affected a term, condition, or privilege of employment; and (5) the victim's employer

knew or should have known of the harassment and failed to take prompt remedial

action. *WC&M Enters.*, 496 F.3d at 399 (Title VII claim); *Johnson*, 7 F.4th at 399–400 (Section

1981 claim). The Court has addressed Ahern's challenge to the first of these elements, which is

established. The second element is also established: Autry is a Mexican-American, and his

evidence makes clear he was harassed based on his race and national origin. The parties'

disputes center on the fourth and fifth elements. Def.'s MSJ at 15–17.

Ahern argues that its conduct amounted to isolated, locker-room talks and was not severe

or pervasive enough to affect a term of Autry's employment. Def.'s Reply to MSJ at 2–3. "To

affect a term, condition, or privilege of employment, the harassment must be sufficiently severe

or pervasive to alter the conditions of the victim's employment and create an abusive working

environment." *West v. City of Houston, Tex.*, 960 F.3d 736, 741–42 (5th Cir. 2020). The alleged

harassment must be "objectively hostile or abusive—meaning . . . that a reasonable person would

find hostile or abusive—and is subjectively perceived by the victim as abusive." *Johnson*, 7

F.4th at 400 (cleaned up).

"To determine whether the victim's work environment was objectively offensive, courts

consider the totality of the circumstances." *WC&M Enters.*, 496 F.3d at 399. "Although no

single factor is determinative, pertinent considerations are (1) the frequency of the discriminatory

conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere

offensive utterance; and (4) whether it unreasonably interferes with an employee's work

performance." *West*, 960 F.3d at 742.

"An egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment." *Lauderaale v. Tex. Dep't of Crim. Justice*, 512 F.3d 157, 163 (5th Cir. 2007). "The inverse is also true: Frequent incidents of harassment, though not severe, can reach the level of 'pervasive.'" *Id*. Thus, "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Id.* (cleaned up).

Here, Autry's summary judgment evidence includes his own deposition testimony and affidavits, together with deposition testimony, of his co-workers—all of whom are members of his protected group. He adduced evidence that several Ahern supervisors, managers, and higher-ranking officers used slurs and derogatory remarks directed towards Hispanics and people of Mexican origin and engaged in other harassing conduct. Pl.'s Resp. to MSJ at 8–12. They include Anthony Buttshaw (Ahern's VP of Sales), Bob Bonacci (Ahern's VP of Operations), Stock (Ahern's Regional Sales Manager), and Torres (General Manager at Ahern's El Paso branch). Except for Torres, whose mother was Hispanic, all of these individuals are white and Caucasian.[57]

Specifically, Autry testified as follows about Buttshaw and Bonacci's conduct. Buttshaw routinely made jokes about Hispanics and people of Mexican origin, often as part of his "Mexican Word of the Day."[58] For example, at a three-day training session at Ahern's home office, Buttshaw constantly made Mexican jokes to Autry, such as "why don't Mexicans

---

[57] Rivera Dep. at 92:2–5, 104:21–105:7; Avila Dep. at 128:16–22.

[58] *See* Autry Dep. at 309:21–310:2 ("I was sick of hearing Anthony's Mexican word of the day. I'm tired of those jokes. Mexican word of the day, Mexican word of the day. Hey, Roy, Mexican word of the day. Hey, Roy, what do you get when you cross a Mexican with this? A donkey or -- I don't even remember. But they were just all Mexican jokes and I was tired of it."); *id.* at 145 ("[T]hose were his favorite jokes.").

barbecue meat?" and  "why the barbecue and beans fall through the grill?"[59]  On another

occasion, when Buttshaw came down to El Paso for a meeting, he cracked "Mexican jokes."[60]

Yet on another occasion, he sent a text message to Avila's phone while Autry was present with

Avila, asking, "Which Mexican is this?"—that is, as Autry understood the message, whether it

was Autry or Avila that Buttshaw was having the text conversation with.[61]   When Autry,

together with other Ahern employees, petitioned the company to help purchase Topgolf (an

entertainment venue with a restaurant and golf driving range) membership cards for their

customers, Bonacci commented, "Do Mexicans even golf?" and "why don't you and [Avila] . . .

take all your Mexican customers to Mexico and then take them to golf over there?"[62]

     Autry testified as follows about Rick Rodriguez (he was Autry's immediate supervisor

before Harley took over that position) and Torres's conduct.  Rodriguez started a rumor that

Autry was "a cocaine dealer" and "tied to the cartel," and told Ahern's employees that "Don't

mess with Roy. . . . he'll send somebody to break your legs."[63]  Since then, Autry would hear

such comments all the time: "Hey, don't mess with Roy, he'll send somebody from Juarez to

break your legs . . . or shoot you or rape your women."[64]  Stock, on a daily basis, called Autry

---

[59] *Id.* at 130:5–21.

[60] *Id.* at 145:18–22 ("And Anthony said, 'Hey, can I tell y'all a joke?' . . . He goes, 'Why does -- do you know why God made Black people smell? . . . So that -- so that the blind people would know where they were at and hate them, too.' . . . And he cracked another one or two Mexican jokes and then he left.  And I don't remember the jokes, but they were racially -- they were jokes about Mexicans.").

[61] *Id.* at 306:9–307:23; *see also* Pl.'s Resp. to MSJ, Ex. B, ECF No. 56-2.

[62] Autry Dep. at 329:8–330:22.

[63] *Id.* at 222:6–11.

[64] *Id.* at 275:21–276:1.

"cockroach" while mimicking the voice of *Tony Montana*.[65]  Autry added that on one occasion,

when he and a Mexican-American customer were speaking in Spanish about getting the

customer's generator repaired, Torres came out and said in front of the customer, "I don't

appreciate y'all talking that shit y'all talk around me.  . . . That Spanish shit."[66]  The customer

became upset and asked for the generator back, saying that he would take his business elsewhere,

and Autry lost an opportunity to earn his business.[67]

Avila, an American citizen of Mexican origin who worked at Ahern from March 2016 to

December 2018,[68] testified about the routine racial slurs he and Autry were subjected to.[69]

Whenever Buttshaw, Bonacci, and Stock visited Ahern's El Paso office, they would call Autry

and Avila "beaner," "wetback," "dirty Mexican," and "filthy Mexican," and tell them "go back

to Mexico."[70]  Buttshaw, Bonacci, and Stock were based out of Ahern offices outside El Paso,

and one or more of them used to visit Ahern's El Paso branch once every two weeks.[71]

---

[65] *Id.* at 316:4–25. Tony Montana is the lead character in the movie *Scarface*, and he is from Cuba.

[66] *Id.* at 141:2–22.

[67] *Id.* at 143:16–144:3; *see also WC&M Enters.*, 496 F.3d at 400 ("Whether [the victim of harassment] lost sales as a result of the alleged harassment is certainly relevant to his hostile work environment claim.").

[68] Avila Aff. at 1.

[69] *See Shattuck v. Kinetic Concepts, Inc.*, 49 F.3d 1106, 1109–10 (5th Cir. 1995) (holding evidence of discrimination against other employees of plaintiff's protected class is "highly probative" of discrimination against the plaintiff); *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 653 (5th Cir. 2012) ("We have held in the context of sex discrimination that harassment of women other than the plaintiff is relevant to a hostile work environment claim." (discussing *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 477–78 (5th Cir. 1989))).

[70] Avila Dep. at 128:16–133:19; Avila Aff. at 3.

[71] Avila Dep. at 132:25–133:8; *see also* Rivera Dep. at 110:8–14 (testifying that Stock was based out of Albuquerque, New Mexico, and visited the El Paso office every fifteen days).

Throughout Avila's employment at Ahern, Torres called Avila by the same racial slurs and told him "go back to Mexico," "stop talking that shit" (in reference to speaking Spanish), "güey, you know I don't talk that shit" (in reference to speaking Spanish), "I can't wait until they build that wall so they can send all you Mexicans back to Mexico," and "bro, you suck cuz you're Mexican."[72]  Torres did so whenever Avila returned to the office (as an outside sales representative, Avila is typically out on the road).[73]  Avila testified that he heard Torres use these same slurs and make these same comments to Autry, and further heard Torres call Autry, a "filthy Mexican roach" and a "Mexican cripple."[74]

Rivera, an American citizen of Hispanic descent who worked at Ahern from July 2014 to October 2016,[75] testified that Torres's favorite words were "beaners," "wetbacks," and "Goddamn Mexicans," and Torres habitually directed those words to the employees, when customers were not around.[76]  Rivera also testified that Stock came to the El Paso office every fifteen days, and when he was in town, Rivera overhead Stock and Torres use "Goddam Mexicans" and "beaners" every day in reference to Ahern employees.[77]

Applying the totality of the circumstances test, the Court finds that Autry has presented sufficient evidence to create an issue of fact as to whether the above-discussed slurs and derogatory remarks constituted objectively offensive harassment and were sufficiently severe or

---

[72] Avila Dep. at 121:18–122:21; Avila Aff. at 2.

[73] Avila Dep. at 122:22–125:20.

[74] Avila Aff. at 2.

[75] Rivera Dep. at 13:12–13, 106:22–107:1.

[76] *Id.* at 94:25–95:18.

[77] *Id.* at 109:10–110:15, 113:17–114:5.

pervasive to alter the conditions of his employment and create a hostile or abusive work environment. *See WC&M Enters.*, 496 F.3d at 400–01 (holding there was sufficiently pervasive and severe harassment based on national origin where over a one-year period, employee was constantly called "Arab" and "Taliban," was told to go back he came from, and received a written warning that said he was acting like a "Muslim extremist"); *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000) (holding that African-American employees who were subjected to a variety of racial slurs every few months over a three-year period raised fact issue as to whether slurs were sufficiently severe or pervasive to violate Title VII), *abrogated on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006).[78]

Next, regarding the fifth element of a hostile work environment claim, Ahern points out that it has policies and procedures in place that require employees to report any workplace discrimination or harassment, and Autry knew about them. Def.'s MSJ at 16–17. Yet, Ahern argues, Autry never complained to its human resources regarding his allegations and never emailed or texted a complaint to anyone. *Id.* at 17. Consequently, Ahern claims, it did not know nor should have known about the alleged harassment.

"[W]here the harassment is allegedly committed by a supervisor . . . [of] the harassment victim, the plaintiff employee needs to satisfy *only* the first four of the elements" of a hostile

---

[78] *See also Gonzalez v. Smith Int'l, Inc.*, 899 F. Supp. 2d 622, 640, 641 643 (S.D. Tex. 2010) (holding Hispanic employees raised fact issues regarding their race-based hostile work environment claims precluding summary judgment, where in the case of one employee-plaintiff—his manager, over a six-month period, routinely made jokes using words like "Mexican," "fucking Mexicans," "beaners," and "wetbacks," and would say things like "[w]e would have more work if you guys would go back"; in the case of the second employee-plaintiff—his manager frequently made remarks such as "Anything south of the checkpoint, man, you-all don't know what you-all are doing down there" and "you dumb Mexicans down there," and the employee witnessed another manager calling a Hispanic co-worker a "stupid ass fat fucking Mexican" at a golf tournament; and in the case of a third employee-plaintiff—who primarily worked in the field, but attended weekly safety meetings at the defendant's shop, his manager made comments about "stupid Mexicans" at every meeting for four-and-a-half years as well as in other contexts).

work environment claim. *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353 (5th Cir. 2001) (emphasis added), *abrogated on other grounds by Vance v. Ball State Univ*., 570 U.S. 421 (2013). "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance*, 570 U.S. at 424; *see also id.* at 429 (A tangible employment action is "a significant change in employment status, such as . . . firing . . . ." (internal quotes and citation omitted)).

Here, as discussed *ante*, Autry presented evidence of derogatory racial remarks and slurs made by Buttshaw, Bonacci, Stock, Torres, and Rodriguez, who are/were, respectively, Ahern's VP of Sales, VP of Operations, Regional Sales Manager, General Manager, and Autry's immediate supervisor. In light of the positions these individuals hold/held at Ahern, which Ahern does not contest, a reasonable jury could conclude that each of them was empowered by Ahern to take tangible employment actions against Autry. Indeed, at Autry's termination meeting, three of these individuals, namely, Bonacci, Stock, and Torres were present. Autry Dep. at 262:2–24. Consequently, to survive Ahern's motion for summary judgment, Autry need not adduce evidence that Ahern knew or should have known of the harassment.

## C. Discrimination Claim

Autry claims that Ahern discriminated against him by terminating him because of his race and national origin. Pl.'s First. Am. Compl. at ¶¶ 38, 41; Pl.'s Resp. to MSJ at 4. A Title VII plaintiff may prove discrimination either by direct or circumstantial evidence. *Stroy v. Gibson ex rel. of Veterans Affs*., 896 F.3d 693, 698 (5th Cir. 2018). "The analytical framework for addressing a Title VII claim depends on whether the plaintiff has presented direct or circumstantial evidence of discrimination." *Lazarou v. Miss. State Univ*., 549 F. App'x 275, 278 (5th Cir. 2013). If the plaintiff's evidence is circumstantial, the court applies the well-

known *McDonnell Douglas* burden-shifting framework.  *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).  Under that framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination.[79]  *Id.*  One element of a prima facie case of discrimination is that the plaintiff "was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group." *Morris v. Town of Indep.*, 827 F.3d 396, 400 (5th Cir. 2016) (cleaned up).

Ahern argues that Autry wholly fails to address this element and therefore, it insists, the Court should grant summary judgment in its favor on his discrimination claim.  Def.'s Reply to MSJ at 4.  Ahern overlooks that Autry pursues only a direct evidence theory of liability, Pl.'s Resp. to MSJ at 14, and in particular, he relies on slurs directed towards his race and national origin as direct evidence of discrimination, *see id.*  Therefore, he need not make that particular showing—which as we have seen, is required if a plaintiff pursues a circumstantial evidence theory of liability under the *McDonnell Douglas* framework.  *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (stating the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination.").  The Court therefore turns to Autry's direct evidence theory.

"'Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact (i.e., unlawful discrimination) *without any inferences or presumptions*.'" *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 40 (5th Cir. 1996) (quoting *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 958 (5th Cir. 1993)).  "[S]tatements . . . which show on its face that an

---

[79] If the plaintiff successfully makes out a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for termination, and if the employer meets that burden, the plaintiff then bears the ultimate burden of proving that the employer's proffered reason was not true but instead was a pretext for discrimination.  *McCoy*, 492 F.3d at 557.

improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action are direct evidence of discrimination." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 993 (5th Cir. 2005).  For workplace statements, remarks, and comments to provide sufficient direct evidence of discrimination, they must be: "1) related to the plaintiff's protected status; 2) proximate in time to the adverse employment action; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue." *Brown v. CSC Logic, Inc*., 82 F.3d 651, 655 (5th Cir. 1996), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 134 (2000)).[80]

Autry argues that persistent racial harassment by the decisionmakers—Harley, Bonacci, Torres, and Stock, who denigrated Autry on a daily basis—constitutes direct evidence of their racial animus toward employees of Mexican descent and is direct evidence that his termination was, at least in part, motivated by that animus.  Pl.'s Resp. to MSJ at 14.  Autry relies on the same evidence of slurs and remarks that, as we have seen, he presents in support of his hostile work environment claim.  *See id.*  Autry however has not pointed to any evidence that the slurs and remarks made by the decisionmakers were "related" to their decision to terminate him.  *Yul Chu*, 592 F. App'x at 263–64, *supra*.  Absent such evidence, an inference is required to casually link the slurs and remarks to Autry's termination.  Consequently, the slurs and remarks do not

---

[80] *Cf. Goudeau v. Nat'l Oilwell Varco, L.P*., 793 F.3d 470, 475 (5th Cir. 2015) (stating the *CSC Logic* test applies "only when the remarks are being used as direct evidence of discrimination," and the test is "more demanding" than when the remarks are being used as one piece of a circumstantial case); *see also Laxton*, 333 F.3d at 583 n.4 (stating, after *Reeves*, 530 U.S. 133, "[w]e continue to apply the *CSC Logic* test when a remark is presented as direct evidence of discrimination apart from the *McDonnell Douglas* framework").  Although *CSC Logic* involved an ADEA discrimination claim, the Fifth Circuit has applied the *CSC Logic* test in the Title VII and § 1983 contexts.  *See, e.g., Auguster v. Vermilion Par. Sch. Bd*., 249 F.3d 400, 405 (5th Cir. 2001) (Title VII and § 1983 racial discrimination claim); *Crisp v. Sears Roebuck & Co*., 628 F. App'x 220, 222 (5th Cir. 2015) (Title VII national origin discrimination); *Lazarou*, 549 F. App'x at 280 (same); *Yul Chu v. Miss. State Univ*., 592 F. App'x 260, 264 (5th Cir. 2014) (Title VII race and national origin discrimination).

serve as direct evidence of discrimination.[81]  Ahern is therefore entitled to summary judgment on Autry's discrimination claim.[82]

### D.  Retaliation Claim

Autry claims that Ahern terminated him for opposing Ahern's discriminatory practices and treatment of him.  Pl.'s First. Am. Compl. at ¶¶ 38, 41; Pl.'s Resp. to MSJ at 4.  Title VII's antiretaliation provision prohibits an employer from "discriminating against" an employee "because that individual 'opposed any practice' made unlawful by Title VII" (the opposition clause), or "'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation" (the participation clause).  *White*, 548 U.S. at 56 (cleaned up) (quoting 42 U.S.C. § 2000e-3(a)).  Section 1981 prohibits, among others, an employer from retaliating against an

---

[81] *Compare Jones v. Overnite Transp. Co.*, 212 F. App'x 268, 273 (5th Cir. 2006) (explaining that supervisor's racist comments, though they "reveal a discriminatory motive on their face," were not direct evidence of discrimination because they "lack[ed] the indicia of . . . causation required to be direct evidence of race discrimination"), *and Harry v. Dallas Hous. Auth.*, 662 F. App'x 263, 266 (5th Cir. 2016) (concluding that supervisor's remarks do not serve as direct evidence of discrimination, where employee failed to show that the remarks "formed a basis for his termination"), *and Yul Chu*, 592 F. App'x at 264 (stating "the alleged jokes and comments about [plaintiff's] accent were not related to the tenure decision at issue, so they are not direct evidence of discrimination," where the plaintiff, a native South Korean, brought race and national origin discrimination claims under Title VII), *with Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861–62 (5th Cir. 1993) (concluding that supervisor's routine use of slurs, including "nigger," constituted direct evidence of discrimination because the supervisor participated in the complained-of disciplinary decisions and his "'I had to dust my little nigger' comment about other instances in which he disciplined [the employee] demonstrates that his racism . . . extended to decisions of the type at bar"), *and Jones*, 427 F.3d at 993 (concluding the employee, who asserted a discriminatory failure to hire claim, presented direct evidence of discrimination, finding that testimony that supervisor said "they . . . were not going to hire a black person unless there were extenuating circumstances" and that "maybe I've been told not to hire too many blacks" "clearly and explicitly indicates that decision maker(s) . . . used race as a factor in employment decisions").

[82] If a plaintiff succeeds in presenting direct evidence of discrimination, "then it becomes the employer's burden to prove by a preponderance of the evidence that the same decision would have been made regardless of the discriminatory animus." *Jones*, 427 F.3d at 992.  Because Autry has filed to adduce direct evidence, the Court pretermits the analysis.

employee because he complained of race discrimination.  *See Foley v. Univ. of Houston Sys*., 355 F.3d 333, 339 (5th Cir. 2003).

Where, as here, a retaliation case is based on circumstantial evidence, the *McDonnell Douglas* burden-shifting framework applies.  *Brown v. Wal-Mart Stores East, L.P*., 969 F.3d 571, 577 (5th Cir. 2020).[83]  So, Autry has the initial burden to establish a prima facie case of retaliation.[84]  To establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in an activity protected; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action."  *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004).  Ahern challenges the first and third elements.  Def.'s MSJ at 13–14; Def.'s Reply to MSJ at 5–8.   Below, the Court addresses each in turn.

### 1.  Protected Activity

"An informal complaint to a supervisor . . . may satisfy the opposition" clause.  *Tureaud v. Grambling State Univ*., 294 F. App'x 909, 914–15 (5th Cir. 2008) (citing, among others, *Jefferies v. Harris Cnty. Cmty. Action Ass'n*, 615 F.2d 1025, 1035–36 (5th Cir. 1980) ("informal, verbal notice given by [employee]" to her supervisors)).  However, mere opposition or complaint is not enough.  *E.E.O.C. v. Rite Way Serv., Inc*., 819 F.3d 235, 240 (5th Cir. 2016).  "Title VII protects only opposition to discrimination based on," as relevant here, "'race, . . . or national

---

[83] Discrimination and retaliation claims asserted under Title VII and § 1981 are analyzed "under the same rubric of analysis," the *McDonnell Douglas* burden-shifting framework.  *Raggs v. Miss. Power & Light Co*., 278 F.3d 463, 468 (5th Cir. 2002).

[84] If the plaintiff establishes a prima facie case, then the employer has the burden of production to provide a legitimate, non-discriminatory reason for the adverse employment action.  *Wal-Mart Stores East, L.P*., 969 F.3d at 577.  If the employer meets this burden, then the plaintiff has the burden to prove that the proffered reason is pretextual.  *Id*.  Ultimately, in order to survive a motion for summary judgment, a plaintiff must show a conflict in substantial evidence on the question of whether the employer would not have taken the adverse employment action but for the protected activity.  *Id*.

origin,'" *Brown v. United Parcel Serv., Inc*., 406 F. App'x 837, 840 (5th Cir. 2010) (quoting 42 U.S.C. § 2000e–2(a)(1)), whereas Section 1981 protects, among others, complaints of racial discrimination, *Foley*, 355 F.3d at 339.

Here, Autry argues that he made multiple complaints regarding "the numerous incidents of racial harassment discussed *supra*."  Pl.'s Resp. to MSJ at 15.  In his brief, Autry does not state what those complaints were or why they constitute protected activities.  Instead, he string-cites several portions of the transcript of his deposition testimony.  *Id.* (citing Autry Dep. at 103:18-104:18; 128:7-15; 130:4-131:16; 132:24; 137:1-6; 139:19-22; 142:23-143:1).  Autry, it thus appears, asks the Court to sift through the cited pages of the transcript and ferret out the specific complaints that pass muster.  *But see Carr v. Air Line Pilots Ass'n, Int'l*, 866 F.3d 597, 601 (5th Cir. 2017) (To carry its burden on a summary judgment motion, "the nonmovant must identify specific evidence in the record *and articulate the precise manner in which that evidence supports his or her claim*." (cleaned up) (emphasis added)).

According to some of the cited portions, on numerous occasions, Autry complained verbally to his supervisors: for example, he made "numerous complaints" to Stock and complained to him about discrimination made the basis of lawsuit "all the time." Autry Dep. at 128:7–15, 132:21–24; *see also id.* at 104:3–11.  However, at his deposition, he was not able to recall the details of these complaints that could have shed light on whether he engaged in any protected activity.  *See id.* at 132:22–133:7.  Nor has Autry submitted other evidence such as affidavits to provide their details.  Consequently, the Court disregards these conclusional allegations of complaints.  *See McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012) ("Summary judgment may not be thwarted by conclusional allegations[.]").

Based on a review of the remaining cited portions of Autry's deposition transcript, the Court observes that Autry allegedly made three oral complaints. The first two related to remarks Brown and Buttshaw made during the three-day training session at Ahern's home office held in January 2015. Specifically, Autry allegedly complained to Bob Frieberg (Ahern's then Operations Manager) and Dan Schultz (Ahern's then VP of Sales) that Brown opened that training sessions, saying "Fuck you all, you motherfuckers. Get out and fucking sell and that's what you need to do." Autry Dep. at 104:12–105:6, 133:13–134:5. This complaint is not a protected activity, because Mark's statement lacked racial or national origin basis. *See, e.g.*, *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009) ("Title VII does not set forth a general civility code for the American workplace." (cleaned up)).

Second, Autry allegedly complained, separately, to Stock, Javier Sanchez (then an Ahern Sales Manager), and possibly other high-ranking supervisors that during the training session, Buttshaw constantly made jokes about Mexicans, such as "why don't Mexicans barbecue meat" and the "barbecue-and-the-beans-fall-through-the-grill" joke. Autry Dep. at 129:7–130:23, 137:1–10. Third, on a separate occasion, Autry allegedly complained to Rodriguez about the incident during which Autry was speaking with a Mexican-American customer in Spanish and Torres told Autry in front of the customer, "I don't appreciate y'all talking that shit y'all talk around me. . . . That Spanish shit." *Id.* at 140:21–143:6.

As to each of the last two complaints, the Court assumes without deciding that Autry engaged in a protected activity. *See, e.g.*, *Carrera v. Com. Coating Servs. Intern., Ltd.*, 422 F. App'x 334, 338–39 (5th Cir. 2011) (stating "[c]omplaining to supervisors about racial harassment is a protected activity," where the employee reported that his supervisors constantly

called him "stupid Mexican" and "f***ing wetback"); *Rite Way Servs.*, 819 F.3d at 242 & n.5 ("An employee is not an expert in hostile work environment law." (cleaned up)).

## 2.   *Causal Link*

"At the prima facie case, a plaintiff can meet his burden of causation simply by showing close enough timing between his protected activity and his adverse employment action," *Garcia v. Prof'l Contract Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019), though the timing gap must generally be "very close," *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001).  At his deposition, Autry could not recall when he complained about Torres's remark referring to the Spanish language as "shit," Autry Dep.  at 140:24–25; nor has he submitted any affidavit, declaration, or other evidence explaining the timing of that complaint.[85]  Autry, though, testified that he complained about Buttshaw's jokes about Mexicans around March 2015.  *Id*. at 132:12–15; *see also id.* at 129:7–9 ("[T]he first time [Stock] was told about the racial discrimination was back in . . . February, March of 2015.").  That is, he made the Buttshaw complaint more than three years before he was terminated in December 2018.  This gap in time is far too long to carry Autry's burden to establish causal link between the complaint and his termination.  *See, e.g.*, *Heggemeier v. Caldwell Cnty., Tex.,* 826 F.3d 861, 870 (5th Cir. 2016) (concluding that "the period of twenty-one months between [employee's] complaint and his termination is simply too substantial a gap to support an inference of causation").

Perhaps recognizing the steep hurdle, Autry does not make any attempt to address the timing of the alleged complaints.  Instead, as his sole evidence of causation, he points to a

---

[85] By reference to other events, it may be inferred that Autry complained about Torres's remark between January and September 2015, or soon thereafter.  Torres was a service manager around January 2015, when Autry attended the three-day training session.  Autry Dep. at 139:2–4.  Autry's testimony suggests that he made the complaint soon after Torres became branch manager.  *See id*. at 140:21–25.  Although the record does not show when Torres became branch manager, by September 2015, he held that position.  Rivera Dep. at 56:19–21, 58:17–21, 97:10–11.

"threat" of termination Torres made.  Pl.'s Resp. to MSJ at 16–17.  According to Autry, at various times, Torres told him and other employees: "Any complaints come out of this office, I'm going to show up and terminate you.  Squeaky wheel always gets the grease.  So be careful if you decide to call HR [*i.e.* Human Resources]."  Autry Dep. at 102:7–10; *see also id.* at 138:15–22; *see also* Crider Aff. ("Bob Freiburg . . . explained to me that on multiple occasions, upper management would retaliate against employees for complaining to H.R.").

In cases where courts have found the requisite causation based on such threats, the threat had some relation or link to the specific protected activity.[86]  In addition, as illustrated in the footnote, in these cases, there was other evidence of causation—such as evidence of temporal proximity between the protected activity and the adverse employment action or evidence that on other occasions, the threat was carried out to retaliate against other employees.

---

[86] *See, e.g.*, *Wallace v. Seton Fam. of Hosps.*, 777 F. App'x 83, 85–86, 91–92 (5th Cir. 2019) (stating supervisor's threat to employee that "she was going to 'get her in trouble' because she got [the supervisor] in trouble with [the supervisor's superior]" "exemplifies a retaliatory motive," where the supervisor made the threat about one month after the employee complained to the superior that the supervisor used racially charged language and the employee was terminated two months after she made complaint); *Bergeron v. Sw. La. Hosp. Ass'n*, 194 F.3d 1308, 1999 WL 766403 at *5–*7, *10 (5th Cir. 1999) (unpublished) (stating employer's threat to employee, an Emergency Room ("ER") nurse, that "if she did not voluntarily transfer, they were 'going to find something' in order to terminate her" "may provide evidence of retaliation," where the supervisor made the threat on the same day when the employee complained to the employer's HR about sexual harassment and the employee was transferred out of ER two weeks after investigation into her complaint concluded and four months after the complaint was made); *Zamora v. City Of Houston*, 798 F.3d 326, 333 335 (5th Cir. 2015) (finding sufficient evidence of causation between suspension of a police officer and his protected activity of making statements to the internal affairs of the police department about retaliation and harassment, where there was evidence that the department "operated under a 'code of silence' in which officers would retaliate against those who complained, spoke out against others, or filed complaints or lawsuits"); *See also Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 320–21 (6th Cir. 2007) (finding sufficient evidence of causation where about two weeks after employee filed an EEOC complaint, employer's HR personnel told her that "he was going either to demote her or to cut her wages if she did not transfer voluntarily into another . . . department" and the employee was terminated three months after she filed the complaint); *cf. Wright v. Southland Corp.*, 187 F.3d 1287, 1306 (11th Cir. 1999) (finding sufficient direct evidence of retaliation where two months after employee filed an EEOC complaint, the employer's HR personnel told him "You will regret it" if he did not drop the complaint, and the employee was terminated one month after the threat, stating that "the threat was clearly linked to the statutorily-protected activity of pursuing a complaint with the EEOC").

Here, the threat is unconnected to Autry's protective activities at issue. Whereas Torres's threat was about any complaint to HR, none of Autry's complaints at issue were made to HR. And, as Ahern points out, from the date of his hire through the date of his termination, Autry never called the HR Hotline, never reported any discrimination to the HR, and never made any complaint of any manner to HR. Autry Dep. at 101:24–102:5; 114:4–17. Further, as mentioned, Autry does not cite to any other evidence of causation. Autry's evidence is insufficient for a reasonable jury to find that there was a causal link between his complaints and his termination. *See Crampton v. Weizenbaum*, 757 F. App'x 357, 366 (5th Cir. 2018) ("The 'scintilla of evidence' of causation that [plaintiff] does present is insufficient to carry her burden on summary judgment."); *Windham v. Harris Cnty., Tex.*, 875 F.3d 229, 234 (5th Cir. 2017) ("[S]ummary judgment remains appropriate if the evidence is merely colorable or not significantly probative." (cleaned up)).

Ultimately, the Court finds that Autry has failed to establish a prima facie case of unlawful retaliation, and therefore, Ahern is entitled to summary judgment on his retaliation claim. *See DeHart v. Baker Hughes Oilfield Operations, Inc*., 214 F. App'x 437, 440 (5th Cir. 2007) ("If an employee does not establish a *prima facie* case, we dismiss the retaliation claims as a matter of law." (citing *Byers v. Dallas Morning News, Inc*., 209 F.3d 419, 429 (5th Cir. 2000))).

## IV. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Defendant Ahern's "Amended Motion to Strike and Motion for Sanction" (ECF No. 67) is **GRANTED IN PART and DENIED IN PART**. As discussed in Part III.A.1 of this Opinion, Ahern's objections to the affidavits at issue

are **SUSTAINED IN PART and OVERRULED IN PART**, and its requests for sanctions

against Plaintiff Autry's counsel is **DENIED**.

IT IS FURTHER ORDERED that Defendant Ahern's "Motion to Strike and Motion for

Sanction" (ECF No. 61) is **DENIED AS MOOT**.

IT IS MOREOVER ORDERED that Defendant Ahern's "Motion for Summary

Judgment" (ECF No. 46) is **GRANTED IN PART and DENIED IN PART**.  The motion is

granted as to Plaintiff Autry's claims for discrimination and retaliation, and it is denied as to

Autry's claims for hostile work environment.

IT IS THEREFORE ORDERED that Plaintiff Autry's claims for discrimination and

retaliation are **DISMISSED**, and the case **SHALL PROCEED** to trial on Autry's claims for

hostile work environment.

So ORDERED and SIGNED this  **28th**  day of September 2021.

**DAVID C. GUADERRAMA**
**UNITED STATES DISTRICT JUDGE**